UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No.3:02cr44(SRU) |
| v. | |
| JEAN GERANCON | April 27, 2005 |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

On March 21, 2005, the United States Court of Appeals for the Second Circuit ordered a limited remand in this case in light of the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), and the Court of Appeals' decision in United States v. Crosby, No. 03-1675, 2005 WL 240916 (2d Cir. Feb. 2, 2005). On March 22, 2005, in light of the remand order, the Government filed a motion with the Court seeking, inter alia, an order requesting the filing of sentencing memoranda to address whether a nontrivially different sentence should be imposed in the wake of Booker and Crosby. The Court subsequently issued such an order and asked the parties to file sentencing memoranda on or before April 27, 2005. This memorandum is filed in response to that order. As discussed more fully below, because a nontrivially different sentence should not be imposed in this case, re-sentencing is not appropriate.

I.    **PROCEDURAL AND FACTUAL BACKGROUND**

From March 20 to May 24, 2001, Drug Enforcement Administration ("DEA") Special Agent Joseph Benson, acting in an undercover capacity, purchased various quantities of cocaine base, i.e., crack cocaine, on six different occasions from the defendant. Four separate times, the defendant sold just under 4 grams, once the defendant sold just over 13 grams, and once the defendant sold just over 26 grams.

Based on these sales, the defendant was arrested by state authorities as he came out of his residence at 151 Fairfield Avenue, in Stamford, Connecticut, on August 7, 2001. On that date, he was found in possession of 24 grams of cocaine base and 21 grams of powder cocaine. A contemporaneous search of his apartment revealed, in the master bedroom, $4920 in cash hidden behind a dresser drawer, an envelope in the dresser drawer containing several pictures of the defendant and another individual posing with a handgun and different denominations of money, and a Berretta handgun loaded with nineteen rounds of .40 caliber bullets, a holster, and an extra magazine in the closet. In a second bedroom, where the defendant's brother had been staying the night before the arrest, police found two additional handguns: a loaded, silver COP .38 Special/.357 Magnum pistol, and a loaded, silver .380 caliber Accu-Tek semi-automatic pistol. The police also found in the second bedroom closet several shoebox-sized packages wrapped in black electrical tape, each package contained a white powdery substance with a perfume odor. As the officers were removing the packages, the defendant's brother stated that they were only "dummies." A lab test showed that the total weight of the substance was 1777 grams and that there were no narcotic substances contained in the packages. Finally, on a shelf in a hall closet, the police found a notebook containing suspected drug records.

On February 13, 2002, a grand jury in New Haven returned a seven count indictment against the defendant which charged him with multiple violations of 21 U.S.C. § 841(a)(1). Specifically, the indictment charged the defendant with four counts of sale of crack cocaine on March 20, 2001, March 23, 2001, March 29, 2001 and April 12, 2001, two counts of sale of in excess of five grams of crack cocaine on April 26, 2001 and May 24, 2001, and one count of possession with intent to sell more than five grams of crack cocaine on August 7, 2001. On March 1, 2002, the defendant was

arraigned on these charges and pleaded not guilty. After filing several motions to continue jury selection, the defendant requested substitute counsel, and the court granted his request. After an additional continuance for his new counsel, the defendant decided to change his plea. On March, 18, 2003, the defendant changed his plea to guilty to count five of the indictment, the most serious count, which charged him with selling in excess of five grams of crack cocaine on April 26, 2001.

In the written plea agreement, the defendant stipulated that the total amount of cocaine base involved in this offense was 78 grams. The Pre-Sentence Report ("PSR") calculated the defendant's base offense level as 32 under U.S.S.G. § 2D.1.1(c)(4), based on the 78 grams of cocaine base involved in the offense, and subtracted three levels for acceptance of responsibility under U.S.S.G. § 3E1.1(a). PSR ¶¶ 26, 32. The PSR attributed no criminal history points to the defendant and, consequently, placed him in Criminal History Category I. PSR ¶¶ 34-35. The resulting guideline range based on these calculations was 87-108 months' incarceration. PSR, Addendum.

The defendant and his counsel met with the government on May 16, 2003 for a safety valve proffer, pursuant to U.S.S.G. § 5C1.2(a)(5). At sentencing on September 19, 2003, the Government maintained that the defendant did not qualify for the safety valve reduction because he was not truthful during the proffer session under § 5C1.2(a)(5), and because his possession of several firearms in connection with his criminal activity otherwise disqualified him under § 5C1.2(a)(2). The Government also maintained that a two-level increase in the defendant's offense level was warranted under § 2D1.1, based on the firearms, drug proceeds, dummy drugs, drug records and photographs depicting the defendant posing with a gun and money, all of which were found in his apartment at the time of his arrest. The Court reviewed the transcript of the proffer session, found that the defendant had not been truthful on several key subjects related to his drug dealing activity,

and refused to apply the safety valve reduction. The Court also rejected the Government's argument that the firearms found in the apartment were connected to the drug offense. Based on these findings and the findings concerning drug quantity and acceptance of responsibility, the court concluded that the adjusted offense level was 29, and the resulting guideline range was 87-108 months' incarceration.

At that point, the court considered the defendant's various arguments for departures from the range. The defendant argued, <u>inter alia</u>, that the court should depart downward because the Government had improperly manipulated his sentencing guideline range by engaging in excessive undercover purchases from him. The defendant relied on <u>United States v. Gomez</u>, 103 F.3d 249, 256 (2d Cir. 1997), and claimed that the Government had engaged in "outrageous" conduct by inducing the defendant to sell greater quantities of cocaine base than he would have otherwise sold. The defendant asked the court "to depart downward to reflect the true level of drug activity engaged in by the defendant." In response, the Government argued that, although the sentencing manipulation argument appeared to be "a viable downward departure claim" in the Second Circuit, the facts of this case did not support its application. The court held that the case was not "outside the heartland of drug cases" and refused to depart:

> This is a relatively straightforward situation with an undercover officer making drug purchases from a source, and I do not at all have the sense that there was sentencing manipulation that took place here. In my view the agent here reasonably, logically and properly developed a relationship, some consistent purchases that gave rise to sufficient trust to ask for a larger purchase. I don't think it's improper for the government to start small to develop that trust and then to test the water to see how big a fish that they have on the line. And I haven't heard anything that suggests outrageous conduct by government or even improper conduct by government.
>
> It's true that the quantities here, given that we're dealing with crack cocaine, very quickly drive the guidelines but that's not government misconduct, that's a decision by Congress and the Sentencing Commission that we're all here living with

4

and obviously I have the discretion to depart downward under the guidelines on either of the grounds sought by the defendant, but in my view a departure would not be appropriate in this case because I don't see any evidence of sentencing manipulation within the meaning of the case law and I don't see that this case is outside the heartland.

The Court ultimately sentenced the defendant to 87 months' incarceration and 5 years' supervised release. The defendant appealed his sentence and raised two claims. First, he argued that the Court should have departed downward pursuant to his sentencing manipulation argument. Second, he claimed, despite his stipulation as to quantity, that the Court had violated his Sixth Amendment rights, as articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004), by placing him at an offense level of 32 based on the 78 gram quantity of cocaine base involved in the offense.

On March 21, 2005, the Second Circuit vacated the defendant's sentence and remanded the case back to this Court for re-sentencing in light of Crosby and Booker. This Court then requested briefing on the threshold question of whether a nontrivially different sentence should have been imposed had the Court understood sentencing law as subsequently explained by the Supreme Court in Booker.

## II. DISCUSSION

### A. Sentencing in the Wake of Booker

In United States v. Booker, 125 S. Ct. 738, 2005 WL 50108 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory."

Booker, 2005 WL 50108, at *16. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." Id. at *24.

The Court of Appeals for the Second Circuit has offered some initial guidance to sentencing courts on how to proceed with sentencings in the wake of Booker. In United States v. Crosby, No. 03-1675, 2005 WL 240916 (2d Cir. Feb. 2, 2005), the Court summarized the impact of Booker as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Slip op. at 24-25 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before Booker/Fanfan." Id. at 20; see id. at 19. In limited circumstances, "precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that

6

either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." <u>Id.</u> at 21. Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." <u>Id.</u> In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One. These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus. Writing

for the remedial majority in Booker, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id., 2005 WL 50108 at *27. As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." *Crosby*, slip op. at 18.

> [I] is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

Id. at 25.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., Booker, 2005 WL 50108 at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of

conviction."); id. at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at *47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). See also United States v. Wanning, No. 4:03-CR-3001-1, slip op. at 6 (D. Neb. Feb. 3, 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing.").

As explained below, this case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a).

**B.    The PSR Properly Calculated the Defendant's Guidelines Sentencing Range at 87-108 Months of Imprisonment**

In this case, the defendant stipulated that the total quantity of cocaine base involved in his offense was 78 grams. This stipulation was based on the total quantity of cocaine base which the defendant sold to Special Agent Benson in March, April and May, 2001, and the quantity of cocaine base which the defendant possessed on the date of his state arrest, August 7, 2001. Thus, the PSR properly calculated the defendant's adjusted offense level to be 29, based on the quantity of cocaine base involved in the offense and taking into account the three level reduction for acceptance of responsibility. See U.S.S.G. § 2D1.1(c)(4). In addition, the Court, after considering the arguments of both parties at sentencing, found that the defendant had not been truthful during his safety valve proffer and, therefore, refused to apply the safety valve reduction under U.S.S.G. § 5C1.2, and found that the presence of the three firearms in the defendant's apartment did not warrant a two-level increase in the offense level under U.S.S.G. § 2D1.1(b)(1).

The defendant requested a downward departure at sentencing. Specifically, he argued that the Government had engaged in "outrageous" sentencing manipulation through its multiple drug purchases from the defendant. He also argued that the defendant's pretrial detention at Bridgeport Correctional Center and Wyatt Detention Facility was unduly harsh and should warrant a lighter sentence. Finally, the defendant himself addressed the Court, and several individuals spoke on his behalf and submitted various supportive letters. In the end, defense counsel argued that the defendant's case fell outside the heartland of similar cases, that the statutory "criteria for sentencing" demanded a sentence outside the guideline range, and that the Court should impose the statutory mandatory minimum 60 month sentence.

The Court considered these arguments and rejected them. There is no basis now to argue that the Court was mistaken in its rulings, and the issues underlying the downward departure request do not suggest that a non-guidelines sentence would be appropriate in this case. The guideline range reflects both the seriousness of the offense at issue (the unlawful distribution of over 50 grams of crack cocaine, an offense which can carry a mandatory minimum ten year sentence under 21 U.S.C. § 841(b)(1)(A)), and the fact that the defendant has no criminal history. When given the chance to reduce his sentencing exposure under the safety valve provision, the defendant lied to the Government and thereby disqualified himself for any additional reduction. The defendant also did not receive any enhancement as a result of the three firearms located in his residence on the date of his arrest. To the Government's knowledge, there are no factors which would suggest that some lesser sentence would have been appropriate. In sum, the government submits that a guidelines sentence is reasonable in this case. Accordingly, because a nontrivially different sentence should be not imposed, the Court should decline to re-sentence the defendant in this matter.

### III.   CONCLUSION

The offense of conviction carried a mandatory minimum sentence of 60 months, and the Court imposed a sentence of 87 months' incarceration, which was at the bottom of the guideline range. The critical inquiry at this junction is whether the Court would have imposed a nontrivially different sentence than the 87 months had it known that the sentencing guidelines were advisory, not mandatory. Based on the argument set forth above, the Court should re-affirm its prior sentence and decline to re-sentence the defendant.

>Respectfully submitted,
>
>KEVIN J. O'CONNOR
>UNITED STATES ATTORNEY
>
>
>ROBERT M. SPECTOR
>ASSISTANT UNITED STATES ATTORNEY
>FEDERAL BAR NO. CT18082
>450 MAIN STREET
>HARTFORD, CT 06103
>860-947-1101

## **C E R T I F I C A T I O N**

  This is to certify that on April 27, 2005 a true and correct copy of the foregoing was sent via regular mail to Mr. Francis L. O'Reilly, 87 Ruane Street, Fairfield, CT 06430; tel. (203) 319-0707, and to United States Probation Officer Christopher Rogers, United States Probation Office, 157 Church Street, 22nd Floor, New Haven, CT; tel. (203) 773-2100.

                ROBERT M. SPECTOR
                ASSISTANT U.S. ATTORNEY